IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| JASON COLLINS,<br>          Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil No.: 3:17cv633 (MHL) |
| | ) | |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br>          Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

REPORT AND RECOMMENDATION

On January 10, 2013, Jason Collins ("Plaintiff") applied for Social Security Disability

Benefits ("DIB") and, on January 31, 2013, applied for Supplemental Security Income ("SSI")

under the Social Security Act ("Act"), alleging disability from fibromyalgia, attention deficit

hyperactivity disorder ("ADHD"), dyslexia, vertigo, short-term memory loss and chronic

depression, with an alleged onset date of September 1, 2012.  The Social Security Administration

("SSA") denied Plaintiff's claims both initially and upon reconsideration.  Thereafter, an

Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the

Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final

decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred in weighing the opinion evidence and relying on the vocational expert

("VE") testimony.  (Br. Supp. Pl.'s Mot. Summ. J. ("Pl.'s Br.") (ECF No. 14) at 4.)  This matter

now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. §

636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for

review.[1]  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    PROCEDURAL HISTORY

On January 10, 2013, Plaintiff filed an application for DIB and, on January 31, 2013, Plaintiff filed an application for SSI, with an alleged onset date of September 1, 2012.  (R. at 87, 97.)  The SSA denied these claims initially on November 7, 2013, and again upon reconsideration on July 28, 2014.  (R. at 96, 121-22, 139, 149.)  At Plaintiff's written request, the ALJ held a hearing on March 15, 2016.  (R. at 11, 158, 186.)  On April 19, 2016, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act.  (R. at 11-27.)  On July 20, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court.  (R. at 1-4.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'"  *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a

---

[1]     The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity.

3

§§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements.  §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations.  §§ 404.1545(a), 416.945(a).  At step four, the ALJ assesses whether the claimant can perform his past work given his RFC.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.     THE ALJ'S DECISION

On March 15, 2016, the ALJ held a hearing during which Plaintiff (appearing with a non-attorney representative) and a VE testified.  (R. at 11.)  On April 19, 2016, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act.  (R. at 27.)

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim.  (R. at 13-26.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 1, 2012.  (R. at 15.)  At step two, the ALJ concluded that Plaintiff had the following severe impairments:  fibromyalgia; ADHD; a dysthymic disorder; and, an anxiety disorder.  (R. at 15.)  At step three, the ALJ found that Plaintiff's combination of impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 16.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light, unskilled work in a non-production-oriented work setting, but with the following limitations:  he could sit

and stand/walk for six of eight hours, alternating between sitting and standing every half hour, and have no interaction with the public and only occasional interaction with co-workers and supervisors. (R. at 17-18.) Additionally, Plaintiff could occasionally climb ramps and stairs, but he could never climb ladders, ropes or scaffolds. (R. at 17.) Plaintiff could frequently grasp, handle, finger and feel bilaterally. (R. at 17.) The ALJ further determined that Plaintiff could have no exposure to hazards, temperature extremes (hot and cold), humidity and wetness. (R. at 17.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 25.) At step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, namely: sorter, mail sorter, routing clerk, addresser, hand bander and document preparer. (R. at 25-26.) Therefore, Plaintiff did not qualify as disabled under the Act. (R. at 26.)

## IV.   ANALYSIS

Plaintiff, forty-one years old at the time of this Report and Recommendation, previously worked as a packer, welder, laborer, warehouse supervisor, sales associate/cashier, machine operator and auto mechanic. (R. at 48-51, 255, 332.) He applied for Social Security Benefits, alleging disability from fibromyalgia, ADHD, dyslexia, vertigo, short-term memory loss and chronic depression, with an alleged onset date of September 1, 2012. (R. at 87.) For the reasons set forth below, the ALJ did not err in her decision.

### A.   The ALJ Properly Considered and Weighed Dr. Shah's Opinions in Relation to the Other Evidence in the Record.

Plaintiff argues that the ALJ erred in assessing his RFC by not providing sufficient reasons for the weight afforded to each medical opinion. (Pl.'s Br. at 12-13.) Plaintiff argues that the ALJ erred in discrediting the opinions of Amar Shah, M.D. — a family medicine

5

physician — because Dr. Shah arrived at conclusions consistent with the "nuances of fibromyalgia." (Pl.'s Br. at 16-18.)  Defendant responds that the ALJ properly weighed Dr. Shah's opinions, because Dr. Shah did not specialize in rheumatology, neurology, orthopedic surgery or orthopedics.  (Br. Supp. Def.'s Mot. Summ. J. ("Def.'s Br.") (ECF No. 16) at 24.) Defendant also asserts that Dr. Shah populated "check-the-box" forms with Plaintiff's subjective complaints and arrived at inconsistent opinions over time.  (Def.'s Br. at 25.)

In determining that Plaintiff did not qualify as disabled, the ALJ considered the records of Dr. Shah and Christopher Ogburn, M.D., — Plaintiff's primary care physicians — and consultative examiners Sari Eapen, M.D., and Linda Scott, Ph.D.; a psychiatric evaluation by Tushar Thakre, M.D., Ph.D.; x-rays of Plaintiff's hips and knees; the opinions of state agency medical and psychological consultants; and, statements provided by Plaintiff, his sister and his former co-worker. (R. at 15-24.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927.  When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.   §§ 404.1527(c), 416.927(c).  If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the

opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Under the applicable regulations and case law, a treating source's opinion will be given controlling weight when medically acceptable clinical and laboratory diagnostic techniques support the source's opinion and when the opinion does not prove inconsistent with other substantial evidence in the record.[2] §§ 404.1527(c)(2), 416.927(c)(2); *Craig*, 76 F.3d at 590; SSR 96-2p. Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of disability (an issue reserved for the Commissioner), or when the treating source's opinion proves inconsistent with other evidence or when other evidence in the record does not strongly support the opinion. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to

---

[2]     Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, and it no longer applies the "treating physician rule." 20 C.F.R. § 404.1520c (2017). Under the new rule, the SSA will consider the persuasiveness of all medical opinions and evaluate them based upon the two most important factors of supportability and consistency. §§ 404.1520c(a), (c)(1)-(2). Plaintiff filed his claims on January 10, 2013, and January 31, 2013, before the regulation took effect. (R. at 15, 76-77, 218-24.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulations do not have retroactive effect, SSR 96-2p and 06-3p apply to Plaintiff's claims.

determine whether a claimant is disabled as that term is defined under the Act.
§§ 404.1527(d)(1), 416.927(d)(1).  Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources."  SSR 06-03p.

Dr. Shah provided three statements — two in 2013 and one in 2016 — opining on Plaintiff's physical limitations.  (R. at 452-59, 474-78.)  In the first, a certificate of fitness completed on August 1, 2013, Dr. Shah opined that Plaintiff had no restrictions carrying/lifting up to fifty pounds, sitting or standing and had a 25% restriction on walking.  (R. at 457-59.)  In the second, a certificate of fitness completed on September 23, 2013, Dr. Shah opined that Plaintiff's conditions fully restricted him from standing and walking.  (R. at 452.)  Dr. Shah also opined that Plaintiff could only carry/lift up to thirty pounds and could only perform a job that required no walking or standing.  (R. at 452-53.)  Finally, on March 9, 2016, Dr. Shah opined that Plaintiff could not sit or stand for more than five minutes at one time, had to elevate his legs 90 degrees for half of an eight-hour workday, could not lift any amount of weight and required a cane or other assistive device to ambulate.  (R. at 474-78.)

The ALJ afforded Dr. Shah's 2016 opinion no weight and his 2013 opinions little weight, finding the opinions contradictory and explaining that Dr. Shah's objective findings remained unchanged from 2012 to 2016.  (R. at 22, 24.)  Moreover, the ALJ noted that Dr. Shah did not assess Plaintiff's gait, strength, reflexes, sensation or coordination.  (R. at 24.)

Dr. Shah's own treatment notes support the ALJ's assignment of weight to his opinions. The record includes Dr. Shah's treatment records of Plaintiff from May 16, 2012, to March 2, 2016.  (R. at 20-24, 392, 395, 422-25, 437-39, 461-63.)  On May 16, 2012, Plaintiff presented to Dr. Shah's practice for the first time since 2009.  (R. at 395.)  Plaintiff complained of chronic

joint pain, but advised that prior blood work tested negative for rheumatoid factor, antinuclear antibody and erythrocyte sedimentation rate. (R. at 395.) Dr. Shah's physical examination revealed significant point tenderness in the chest, shoulders, elbows, wrists, knees, thighs, upper and lower back and ankles. (R. at 395.) However, Plaintiff's joints evidenced no warmth or swelling. (R. at 395.) Dr. Shah diagnosed Plaintiff with fibromyalgia and prescribed Neurontin and Flexeril. (R. at 395.)

On June 15, 2012, Plaintiff returned to Dr. Shah's practice for a follow-up appointment on his fibromyalgia, this time seeing Dr. Ogburn. (R. at 393.) Plaintiff stated that Neurontin had eliminated his pain, except for flares when the weather changed. (R. at 393.) Plaintiff had discontinued Flexeril, because it made him groggy. (R. at 393.) On examination, Dr. Ogburn noted tenderness in Plaintiff's wrists, shoulders and elbows. (R. at 393.) Dr. Ogburn increased Plaintiff's Neurontin dosage. (R. at 393.)

On August 23, 2012, Plaintiff returned to Dr. Shah for a follow-up appointment, complaining that Neurontin had lost its effectiveness. (R. at 392.) Despite Plaintiff's complaints that he experienced the worst pain in his arms, legs, back and chest, Plaintiff's physical examination produced normal results. (R. at 392.) Plaintiff further complained of significant difficulty concentrating and focusing on tasks. (R. at 392.) Dr. Shah discontinued Plaintiff's Gabapentin (generic Neurontin) and prescribed Lyrica. (R. at 392.) Dr. Shah added diagnoses of attention deficit disorder, dysthymia and anxiety/insomnia, and prescribed Fluoxetine. (R. at 392.) Dr. Shah advised Plaintiff to return in one month. (R. at 392.) Plaintiff did not return until August 1, 2013. (R. at 424.)

On August 1, 2013, Plaintiff visited Dr. Shah for the first time following his alleged onset date. (R. at 424.) Plaintiff wanted to follow-up on his treatment for fibromyalgia and

depression. (R. at 424.) He had recently started a job at Amazon that required a tremendous amount of walking. (R. at 424.) Plaintiff wanted to restart his medication and obtain paperwork to help him transfer to a job that required less walking. (R. at 424.) Dr. Shah noted that although Plaintiff complained of depression and difficulty concentrating, Plaintiff had not complied with his previous Fluoxetine prescription. (R. at 424.)

On examination, Plaintiff appeared pleasant, well-nourished and well-hydrated. (R. at 424.) Plaintiff endorsed tenderness in his elbows, hips, knees, shoulders and feet. (R. at 424.) However, Dr. Shah noted good capillary refill in Plaintiff's nail beds and no edema, cyanosis or clubbing in his extremities. (R. at 424.) Dr. Shah restarted Plaintiff on Fluoxetine and Gabapentin. (R. at 425.) That same day, Dr. Shah completed the first certificate of fitness, detailed above. (R. at 457-58.)

On September 23, 2013, Plaintiff returned to Dr. Shah for a follow-up appointment for his depression, anxiety and fibromyalgia. (R. at 422.) Plaintiff stated that he needed documentation reflecting his work restrictions. (R. at 422.) Dr. Shah's physical examination remained unchanged from Plaintiff's previous visit. (R. at 422, 424.) Dr. Shah diagnosed Plaintiff with unspecified myalgia and myositis, as well as a dysthymic disorder. (R. at 422.) In response to Plaintiff's complaints regarding the ineffectiveness of his medications, Dr. Shah increased his Fluoxetine dosage, discontinued his Gabapentin prescription and prescribed Savella. (R. at 422-23.) Dr. Shah then completed his second opinion, detailing more severe limitations than described in his first opinion from one month earlier. (R. at 452, 457-58.)

Plaintiff next presented to Dr. Shah on November 4, 2014. (R. at 437.) Plaintiff wanted to discuss medication for insomnia, depression and fibromyalgia. (R. at 437.) Plaintiff complained that Gabapentin, Savella and Fluoxetine had all failed to alleviate his symptoms,

10

though Dr. Shah noted that Plaintiff had discontinued Savella after one month. (R. at 437.) Plaintiff's physical examination remained unchanged. (R. at 422, 437-38.) Dr. Shah discontinued Plaintiff's Fluoxetine, restarted the Gabapentin and added prescriptions for Tramadol, Flexeril and Sertraline. (R. at 438.)

On March 2, 2016, Plaintiff presented to Dr. Shah for the final time before the ALJ hearing. (R. at 461-63.) Although Plaintiff's complaints of pain intensified since his last visit in November 2014, Dr. Shah's physical examination of Plaintiff again remained unchanged. (R. at 438, 462.) Specifically, Dr. Shah's physical examination revealed tenderness in Plaintiff's elbows, hips, knees, shoulders and feet. (R. at 438, 462.) Plaintiff again appeared pleasant and well-nourished, and he exhibited good capillary refill in his nail beds with no edema, cyanosis or clubbing in his extremities. (R. at 437-38, 462.) Shortly after that visit, Dr. Shah completed his third and most restrictive medical opinion. (R. at 474-78.)

These treatment notes support the ALJ's determination that Dr. Shah's 2016 opinion deserved no weight and his 2013 opinions deserved little weight. First, the degree of limitation suggested by Dr. Shah does not comport with the scant objective medical evidence in his physical examinations of Plaintiff. Dr. Shah's physical examinations produced identical results from 2013 to 2016. (R. at 422, 424, 437-38, 462.) For example, Dr. Shah reported verbatim his musculoskeletal examinations in all of Plaintiff's treatment records. (R. at 422, 424, 437-38, 462.) Namely, Dr. Shah noted tenderness in Plaintiff's elbows, hips, knees, shoulders and feet. (R. at 422, 424, 437-38, 462.) Moreover, Dr. Shah consistently observed good capillary refill in Plaintiff's nail beds and no clubbing, cyanosis or edema in his extremities. (R. at 422, 424, 437-38, 462.) Nowhere in Dr. Shah's treatment records did he record observations of Plaintiff's gait, reflexes or coordination, nor did he indicate that Plaintiff required an assistive device to

11

ambulate. (R. at 422, 424, 437-38, 462.) Instead, Dr. Shah simply noted — as recently as March 2016 — that Plaintiff denied coordination or gait abnormalities. (R. at 422, 424, 438, 462.) In this respect, Dr. Shah's March 2, 2016, treatment notes flatly contradict his March 9, 2016, opinion that Plaintiff required an assistive device. (R. at 462, 476.)

Plaintiff contends that the absence of objective evidence supporting Dr. Shah's opinions should not discredit those opinions, because "the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" (Pl.'s Br. at 19 (quoting SSR 12-2p).) However, Plaintiff fails to mention that SSR 12-2p admonishes the Agency to "ensure there is sufficient objective evidence to support" a finding that a claimant qualifies as disabled due to fibromyalgia. SSR 12-2p. Furthermore, Plaintiff's subjective allegations of pain do not, alone, establish conclusive evidence that Plaintiff qualifies as disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Plaintiff urges the Court to accept Dr. Shah's opinions at face value. (Pl.'s Br. at 20-21.) However, these opinions simply recite Plaintiff's subjective complaints and do not find support in Dr. Shah's treatment records. (R. at 452-59, 474-78.) The ALJ properly gave little to no weight to these opinions. *See Craig*, 76 F.3d at 590 (explaining that when a treating physician offers a conclusory opinion based on patient's subjective reports of pain, the opinion should be offered significantly less weight). Here, Dr. Shah's own treatment records do not support the extreme degree of limitation to which he opined.

12

Second, other objective medical evidence in the record contradicts Dr. Shah's opinions. On August 23, 2013, Plaintiff reported to John Randolph Medical Center for x-rays of his knees and pelvis. (R. at 403-05.) The x-rays produced unremarkable results, showing no evidence of fracture, dislocation or abnormal joint spaces. (R. at 403-05.)

On September 11, 2013, Plaintiff visited Dr. Eapen for a consultative examination. (R. at 407-11.) Dr. Eapen's examination produced normal results. (R. at 408-09.) Plaintiff ambulated without any assistive device, and he evinced a stable gait with good mobility. (R. at 408.) He had full range of motion in his spine, shoulders, elbows and wrists, and exhibited normal muscle strength in both upper extremities. (R. at 409.) Dr. Eapen found no evidence of erythema, swelling, significant joint tenderness or active joint inflammation. (R. at 409.) She noted that Plaintiff could hop, walk on his toes and heels, and exercise a full range of motion in his hips, knees and ankles. (R. at 409.) These findings contradict Dr. Shah's opinion that Plaintiff's conditions fully restricted him from standing, walking and lifting any weight above thirty pounds. (R. at 452.)

The unremarkable x-rays of Plaintiff's knees and pelvis and the examination by Dr. Eapen also belie the severity of Plaintiff's symptoms as reported in Dr. Shah's opinions. In short, Dr. Shah's opinions stand alone in their severe depiction of Plaintiff's fibromyalgia.

Finally, Plaintiff's own statements contradict the degree of limitation suggested by Dr. Shah's opinions. On December 16, 2013, Plaintiff completed a function report stating that he could maintain his own personal care, complete household chores, drive and shop for groceries and clothing. (R. at 285-92.) He could also prepare simple meals and wash dishes. (R. at 287.) Moreover, during the hearing, Plaintiff testified that he could sit for thirty minutes before having to stand, and stand for fifteen minutes before having to sit. (R. at 55.) Plaintiff also testified that

13

he could comfortably lift twenty to thirty pounds. (R. at 55.) Plaintiff further stated that he made his bed every day, went bowling five months before the hearing, and could peel a potato and open a jar. (R. at 56-59.)

When Plaintiff met with Dr. Scott in September 2013, he explained that he could take out the trash, vacuum, cook and help with laundry. (R. at 415.) He also enjoyed playing the drums and video games. (R. at 415.) Plaintiff further stated that he could drive without difficulty and go to the grocery store. (R. at 415.)

Dr. Shah's own treatment records do not provide support for the degree of limitation to which he opined. Instead, his records simply recite findings of multiple point tenderness alongside otherwise healthy physical examinations. (R. at 422, 424, 437-38, 462.) Moreover, Dr. Eapen's examination, in which Plaintiff exhibited normal muscle strength in both upper extremities, sharply contravenes Dr. Shah's opinion that Plaintiff's conditions fully restricted him from lifting any amount of weight. (R. at 409, 477.) Finally, Plaintiff himself contradicted Dr. Shah's opinion when he testified during the hearing that he could comfortably lift twenty to thirty pounds. (R. at 55, 477.) Thus, substantial evidence supports the ALJ's decision to afford little to no weight Dr. Shah's opinions.

**B.      Substantial Evidence Supports the ALJ's Reliance on the VE's Testimony.**

Plaintiff also argues that the ALJ failed to adequately address his post-hearing objections to the VE's testimony. (Pl.'s Br. at 7-8.) Specifically, Plaintiff argues that pursuant to the Hearings, Appeals and Litigation Law Manual ("HALLEX") § I-2-5-55 (2016), "[i]f a claimant raises an objection about a VE's opinion, the ALJ must rule on the objection and discuss any ruling in the decision." (Pl.'s Br. at 8.) Plaintiff argues that the ALJ did not sufficiently address his objections that the ALJ: (1) improperly relied on a "sit/stand option" in a workplace as the

14

option constitutes a "reasonable accommodation" under the Americans with Disabilities Act

("ADA"); (2) abused her discretion by denying Plaintiff a full and fair hearing; and, (3) failed to

account for the unreliability of the job incidence data provided by the VE. (Pl.'s Br. at 7-8; R. at

341-80.)  In her decision, the ALJ discussed and overruled Plaintiff's second and third

objections.  (R. at 11-13.)  However, the ALJ did not address Plaintiff's reasonable

accommodation objection.  (R. at 11-27.)  For the reasons that follow, the Court finds that the

HALLEX did not compel the ALJ to rule on all post-hearing objections, and that the ALJ

sufficiently explained the reasoning behind her decision.

### 1.  The Classification of the Sit/Stand Option as a Reasonable Accommodation did not Invalidate the ALJ's Hypothetical to the VE.

Plaintiff argues that the ALJ did not acknowledge Plaintiff's objection regarding the

sit/stand option.  (Pl.'s Br. at 8.)  Plaintiff contends that the U.S. Equal Employment Opportunity

Commission ("EEOC") has concluded that a "sit/stand option" in a workplace constitutes a

"reasonable accommodation" under the ADA, and that the SSA cannot take a reasonable

accommodation into account when making a disability determination. (Pl.'s Br. at 10 (citing

SSR 00-1c)).  Defendant notes that courts in the Fourth Circuit have consistently recognized the

sit/stand option.  (Def.'s Br. at 21-22.)

When the ALJ posed the second hypothetical to the VE, she incorporated a sit/stand

option. (R. at 78-79.)  Specifically, the ALJ's hypothetical stated that Plaintiff would need to

alternate between sitting and standing in place every half hour.  (R. at 79.)  After the VE had

listed several jobs that Plaintiff could perform given that hypothetical, the ALJ asked the VE

whether her testimony conflicted with the DOT.  (R. at 81.)  The VE answered that the DOT

does not recognize a sit/stand option.  (R. at 81.)  The VE went on to explain that the sedentary

jobs — i.e., addresser, hand bander and document preparer — would allow for an individual to

alternate between sitting and standing, because workers generally performed them seated. (R. at 81.) The VE also testified that the light jobs — i.e., garment bagger, sorter, mail sorter and routing clerk — could be performed seated or standing as long as the individual remained on task at least 85% of the time. (R. at 79-81.) The ALJ then asked whether the VE had based that information on her experience, to which the VE replied affirmatively. (R. at 81.)

Plaintiff's sole source of authority for his argument against the sit/stand option stems from SSR 00-1c. (Pl.'s Br. at 10-11.) Plaintiff misconceives this Social Security Ruling. Social Security Ruling 00-1c articulates SSA policy following *Cleveland v. Policy Management Systems Company*, 526 U.S. 795 (1999). There, the plaintiff's condition improved soon after she filed for Social Security disability benefits, prompting her return to work. *Id.* at 797-807. She reported her return to the SSA, which then denied her claim. *Id.* The plaintiff's employer subsequently terminated her, and in response she brought an ADA suit alleging that her employer fired her without accommodating her disability. *Id.* at 798-99. The lower courts held for the employer, finding that the plaintiff had conceded total disability by applying for Social Security benefits. *Id.* at 799-800. On appeal, the Supreme Court reversed, holding that an ADA claim could comfortably exist side by side with a DIB claim, and that where a plaintiff makes genuinely contradicting statements in her applications for both she will have an opportunity to provide a sufficient explanation for that contradiction. *Id.* at 802-06.

Social Security Ruling 00-1c thus established that a court cannot automatically dismiss a plaintiff's ADA claim when she has previously applied for Social Security benefits. SSR 00-1c. Nowhere in that ruling does it state, or even suggest, that the inclusion of a "reasonable accommodation" under the ADA in an ALJ's hypothetical question renders that hypothetical invalid. SSR 00-1c. Moreover, as Defendant observes, the Fourth Circuit has recognized the

16

validity of a sit/stand option. (Def.'s Br. at 21-22;) *see Walls v. Barnhart*, 296 F.3d 287, 291-92 (4th Cir. 2002) (affirming ALJ's reliance on VE's testimony concerning sit/stand option). In fact, ALJs frequently include the sit/stand option in their hypotheticals, and courts in the Fourth Circuit consistently allow it. *See, e.g., Martin v. Berryhill*, 2017 WL 3446573, at *14-15 (D.S.C. Aug. 11, 2017); *Golini v. Astrue*, 2011 WL 4409223, at *2, *5-6 (E.D. Va. Aug. 16, 2011); *Clemons v. Astrue*, 2011 WL 900142, at *9 (E.D. Va. Jan. 2, 2011); *Gibson v. Astrue*, 2010 WL 4789659, at *4-6 (E.D. Va. Oct. 27, 2010).

Because courts in this Circuit have consistently approved of an ALJ's use of a sit/stand option in an RFC and the corresponding hypothetical, and because the limitation does not conflict with SSR 00-1c, Plaintiff's objection to the sit/stand must fail.

### 2. The ALJ is not Required to Rule Upon All Post-Hearing Objections to the VE's Testimony.

Plaintiff argues that the ALJ failed to sufficiently address all his post-hearing objections to the VE's testimony. (Pl.'s Br. at 7-8.) Plaintiff complains that the ALJ did not sufficiently address the reasonable accommodation objection discussed above, as well as objections that the ALJ: (1) abused her discretion by denying Plaintiff a full and fair hearing, and (2) failed to account for the unreliability of the job incidence data provided by the VE. (Pl.'s Br. at 7-8.) Plaintiff relies on HALLEX § I-2-5-55 (2016) to argue that the ALJ had an obligation to "rule on the objection and discuss any ruling in the decision."[3] (Pl.'s Br. at 8.) Plaintiff's argument lacks merit.

---

[3] On June 16, 2016, HALLEX § I-2-5-55 was amended, and the language quoted by Plaintiff removed. However, at the time of the ALJ's decision, § I-2-5-55 contained the quoted language. *See* HALLEX § I-2-5-55 (2016), https://web.archive.org/web/20150509224242/https://www.ssa.gov/OP_Home/hallex/I-02/I-2-5-55.html.

Intra-agency manuals do not bind the Agency. *Schweiker v. Hansen*, 450 U.S. 785, 789 (1981) ("the Claims Manual is not a regulation. It has no legal force and does not bind the SSA. Rather, it is a 13-volume handbook for internal use by thousands of SSA employees.") As this Court has previously held, "interpretations contained in policy statements, agency manuals and enforcement guidelines [including HALLEX] lack the force of law." *Parham v. Colvin*, 2015 WL 1649143, at *15 (E.D. Va. Apr. 13, 2015) (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000), *rev'd and remanded on other grounds sub nom. Parham v. Comm'r of Soc. Sec.*, 627 F. App'x 233 (4th Cir. 2015). While the Fourth Circuit has not formally addressed this issue, many district courts within this Circuit have held that the HALLEX does not create judicially enforceable rights. *See, e.g.*, *Young v. Colvin*, 2014 WL 1874984, at *3 (W.D.N.C. May 9, 2014); *Shrader v. Astrue*, 2013 WL 1192315, at *3 (N.D. W. Va. Mar. 22, 2013); *Harris v. Astrue*, 2012 WL 7785082, at *6 (N.D. W. Va. Nov. 30, 2012); *Melvin v. Astrue*, 602 F. Supp. 2d 694, 704 (E.D.N.C. 2009).

In her decision, the ALJ acknowledged Plaintiff's objection that the ALJ abused her discretion by precluding Plaintiff's hearing-level representative from asking the VE more than ten questions. (R. at 12-13.) The ALJ also acknowledged Plaintiff's objection concerning the unreliability of the job incidence data relied upon by the VE. (R. at 12-13.) The ALJ overruled both objections, finding that the VE had fully answered Plaintiff's questions, and that regulations foreclosed objections concerning the unreliability of the job data. (R. at 12-13.)

The ALJ sufficiently addressed and appropriately overruled Plaintiff's objections to the VE's testimony. With respect to the abuse of discretion objection, the ALJ found that Plaintiff's representative had "the opportunity to ask ten questions addressing the vocational expert's qualifications, the sources of information used in identifying jobs and their numbers in the

national economy, and the specific requirements of some of those jobs." (R. at 12.) The ALJ

further noted that Plaintiff's "post-hearing brief addressed all of the same issues." (R. at 12.)

The ALJ thus concluded that the VE provided "detailed answers to [Plaintiff's] questions at the

hearing . . . [and] fully explained her use of . . . acceptable sources in identifying jobs and their

numbers in the national economy." (R. at 13.)

The ALJ also provided a sufficient explanation for overruling Plaintiff's objection to the

unreliability of the job incidence data. The ALJ found that "agency policy establishes that there

are acceptable electronic versions of the Dictionary of Occupational Titles ["DOT"] available for

use, including SkillTRAN Job Browser Pro." (R. at 13.) Although the ALJ did not specifically

address Plaintiff's "reasonable accommodation" objection, this objection has no legal support, as

discussed above. The ALJ provided a sufficient explanation for her decision to render that

decision reviewable by this Court. *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656 (4th

Cir. 2017). In short, the ALJ showed her work.

### 3. The ALJ Did Not Abuse Her Discretion When She Limited Plaintiff's Representative to a Ten-Question Cross-Examination.

Plaintiff argues that by limiting Plaintiff's representative to a ten-question cross-

examination of the VE, the ALJ abused her discretion by precluding Plaintiff from corroborating

the reliability of the job incidence data relied upon by the VE. (Pl.'s Br. at 9-10.) Defendant

responds that the ALJ may set reasonable limits on testimony, and that Plaintiff's representative

had a full opportunity to question the VE about the methodology that she used to determine the

availability of jobs. (Def.'s Br. at 19-20.) Defendant also notes that the ALJ kept the record

open for two weeks to permit Plaintiff's representative to submit objections to the VE's

testimony. (Def.'s Br. at 20.)

The Court reviews the ALJ's decision to limit Plaintiff's representative to a ten-question cross-examination for abuse of discretion. SSR 13-1p. Abuse of discretion occurs when an ALJ acts erroneously and without any rational basis or is clearly not justified under particular circumstances of the case, such as when the ALJ improperly exercises or fails to exercise administrative authority. SSR 13-1p. For example, if the record shows that the ALJ failed to allow the claimant to testify or cross-examine the witnesses, an abuse of discretion has occurred. SSR 13-1p. However, the extent of cross-examination rests in the sound discretion of the ALJ, and an ALJ "may set reasonable limits on testimony." *Harris v. Matthews*, 430 F. Supp. 1335, 1340 (D. Md. 1977); *see also York v. Colvin*, 2014 WL 4181616, at *6 (D. Me. Aug. 21, 2014) (finding that an ALJ did not abuse his discretion when the ALJ limited claimant's testimony to the four corners of the submitted medical evidence). Moreover, the ALJ need not allow repetitious questioning of a VE when the ALJ determines that the VE has sufficiently addressed an issue. *See Burgess v. Astrue*, 2010 WL 5684398, at *5-6 (D.S.C. Dec. 10, 2010) (finding no abrogation of due process when the ALJ disallowed plaintiff's counsel from continuing to question VE on reliability of job incidence data).

Here, the ALJ limited Plaintiff to ten questions during cross-examination of the VE. (R. at 82-85.) Plaintiff's representative began by asking the VE when she had last placed an individual into any of the sedentary jobs that the VE listed in response to the second hypothetical (which incorporated the contested sit/stand option). (R. at 82.) The VE responded that she had never placed anyone into one of those jobs. (R. at 82.) Plaintiff then asked when the VE had last placed any disabled individual into any job, to which the VE responded "[l]ast year." (R. at 82.) Plaintiff then objected to — and the ALJ overruled — the VE's lack of current experience in job placement. (R. at 82.)

Plaintiff next asked which sources the VE used to derive job numbers. (R. at 82.) The VE answered that she used the DOT, county business patterns, census reports, occupational analysis, and the Occupational Outlook Handbook ("OOH"). (R. at 82-83.) Plaintiff then asked from where exactly the numbers for each job came. (R. at 83.) The VE explained that she used software called SkillTRAN Job Browser Pro ("Job Browser Pro"). (R. at 83.) The ALJ then advised Plaintiff's representative that "we're running over. So one more question." (R. at 83.) Plaintiff asked the VE what North American Industry Classification System codes or titles that she eliminated when calculating the job numbers. (R. at 83.) The VE responded that the information that she used included codes from multiple sources, and that Job Browser Pro extrapolates numbers provided through the Department of Labor and then eliminates part-time work. (R. at 83.) Unsatisfied, Plaintiff again asked which codes or titles the VE had eliminated when calculating the job numbers. (R. at 83.) The VE answered that she eliminated all information that did not pertain to the specific DOT job title in question. (R. at 83.)

The ALJ then stopped the questioning. (R. at 84.) Plaintiff's representative asked the record to note that the ALJ had precluded her from fully questioning the VE. (R. at 84.) The ALJ then allowed her to ask two more questions. (R. at 84.) Plaintiff next asked whether an addresser, hand bander and document preparer only require frequent handling, fingering, grasping and feeling bilaterally. (R. at 85.) Finally, Plaintiff asked if the position of router required occasional fingering. (R. at 85.) The VE answered affirmatively to both questions. (R. at 85.) The ALJ then advised Plaintiff that she would hold the record open for two weeks to allow him to submit additional evidence and a post-hearing brief. (R. at 85.)

As noted above, the ALJ need not allow repetitious questioning when the ALJ determines that the VE has sufficiently addressed an issue. *Burgess*, 2010 WL 5684398, at *5-6. In

*Burgess*, the plaintiff alleged a due process violation, because the ALJ prohibited her from questioning the VE without limitation. *Id.* at 5-7. Specifically, the ALJ cut off plaintiff's counsel when she repeatedly questioned the VE regarding the foundation of his testimony. *Id.* at 6. The plaintiff wanted specific testimony that the VE had placed individuals in jobs that incorporated a sit/stand option, and the VE consistently stated that he based his testimony on his experience placing individuals in those jobs. *Id.* The court found that the ALJ properly determined that the VE had sufficiently addressed the issue, and that "'the conduct of the hearing rests generally in the examiner's discretion.'" *Id.* at 6 (quoting *Richardson v. Perales*, 402 U.S. 389, 400 (1971)).

Here, the ALJ allowed Plaintiff to ask the VE ten questions during cross-examination. (R. at 82-85.) During that time, Plaintiff questioned the VE about her experience in job placement, the sources that she used to derive job incidence data and how she eliminated codes to derive job numbers specific to certain DOT titles. (R. at 82-85.) The VE fully answered each question, explaining her experience in job placement and detailing how she used Job Browser Pro to derive job numbers. (R. at 82-83.) The VE also explained that Job Browser Pro culls information from the DOT, county business patterns, census reports, occupational analysis and the OOH. (R. at 82-83.) The ALJ thus allowed the VE to fully explain the source of the job incidence data that she used.

When the ALJ interrupted the cross-examination, Plaintiff's representative objected, arguing that she had additional questions for the VE. (R. at 84-85.) The ALJ then relented and allowed Plaintiff to ask two more questions. (R. at 85.) Notably, Plaintiff did not continue questioning the VE about her methodology. (R. at 85.) Instead, Plaintiff asked questions concerning the manipulation requirements of the respective jobs identified by the VE. (R. at 85.)

22

Plaintiff's failure to pursue questioning on the job numbers methodology when the ALJ presented an opportunity to do so suggests that the representative had exhausted her questions on this issue. Even if questions remained, the ALJ afforded Plaintiff a two-week window to submit additional evidence and a post-hearing brief. (R. at 85.) Plaintiff did so on April 1, 2016. (R. at 341-49.) In Plaintiff's post-hearing brief, he objected at length to the VE's use of Job Browser Pro. (R. at 341-45.)

The ALJ acknowledged Plaintiff's post-hearing brief. (R. at 12-13.) Specifically, the ALJ noted that Plaintiff objected to the VE's qualifications, the sources of information that she used to provide testimony and the requirements of the jobs identified. (R. at 12.) The ALJ concluded that she afforded Plaintiff a full and fair hearing. (R. at 12.) The Court agrees.

The ALJ provided Plaintiff with ample opportunity to present evidence and contest the VE's testimony. The VE explained the program that she used, where the information for that program came from and how she eliminated irrelevant codes in determining accurate job information. (R. at 82-85.) Plaintiff does not identify a line of questioning that he would have pursued had the ALJ allowed his representative to continue. (Pl.'s Br. at 9-10.) Instead, Plaintiff merely asserts that the ALJ prevented him from finishing "his cross-examination of the vocational expert on how the job numbers were derived. . . ." (Pl.'s Br. at 10.)

Given that the VE identified the program and the process through which she derived the job numbers, and the ALJ considered Plaintiff's detailed post-hearing objections to Job Browser Pro, the ALJ did not abuse her discretion or fail to conduct a full and fair hearing.

### 4. The ALJ Appropriately Relied on the Job Incidence Data that the VE Provided.

Plaintiff argues that the ALJ also improperly relied on the VE's testimony by failing to account for the unreliability of the job incidence data. (Pl.'s Br. at 7.) Specifically, Plaintiff

argues that the VE did not rely on current and reliable information. (Pl.'s Br. at 7.) The ALJ simply stated that the Agency considers Job Browser Pro an acceptable electronic version of the DOT. (R. at 13.)

On December 28, 2009, the SSA's Director of the Division of Field Procedures issued an internal memorandum to the regional management officers. Memorandum from Susan Swansiger, Dir., Div. of Field Procedures, SSA, to Reg'l Mgmt. Officers (Dec. 28, 2009). In that memorandum, the Director listed Job Browser Pro as an acceptable version of the DOT and stated that the program met the requirements of SSR 00-4p. *Id.* Specifically, the memorandum states that "four acceptable electronic versions of the . . . DOT[] are currently available at http://ssahost.ba.ssa.gov/digitallibrary . . . ." *Id.* Under the second bullet point, the memorandum explained SkillTRAN Job Browser Pro as follows:

> This Program provides a searchable copy of the DOT. Users can search by job title, DOT code or keyword(s) within the title, and task description. After selecting an occupation and clicking "Details", users can find all DOT/SCO information on the "Quick View – Codes" button. Through the advanced search, it also allows searches by a variety of other lists, such as GOE or occupational group, all of which can be useful when performing transferability of skills analysis.

*Id.* The Director instructed the regional management officers to share her memorandum with all ALJs. *Id.* Moreover, the Agency administratively recognizes the reliability of the following sources of information: the DOT; county business patterns; census reports; occupational analyses; and, the OOH. 20 C.F.R. §§ 404.1566(d), 416.966(d). According to both Plaintiff's post-hearing brief and the VE's testimony, Job Browser Pro collects its job incidence data from these administratively recognized sources. (R. at 82-83, 370.) Thus, by regulation and Agency policy, the VE properly relied on data that she retrieved from Job Browser Pro.

Finally, courts do not impose "impossible burdens" by requiring the VE to procure full-time-only data from purely government sources. *Guiton v. Colvin*, 546 F. App'x 137, 142 (4th Cir. 2013). The Fourth Circuit has observed that no program provides "data, updated on a regular basis, available through either a public or private source, that reports numbers of jobs by DOT code number." *Id.* (quoting hearing transcript). Thus, the Fourth Circuit allows a margin of error within which VEs may estimate job numbers in the economy, even if those numbers are "somewhat imprecise." *Id.*

Because the Agency administratively recognizes the acceptability of Job Browser Pro, and because the Court will not impose an impossible burden on the VE, the ALJ properly relied on the VE's job incidence data.

## C. The Appeals Council Properly Rejected the Santagati Report.

Finally, Plaintiff argues that the Appeals Council erred when it rejected a vocational report prepared by Paula F. Santagati (the "Santagati Report"). (Pl.'s Br. at 5-6.) Plaintiff contends that the Report constitutes "new and material" evidence. (Pl.'s Br. at 5-6.) According to Plaintiff, the Santagati Report constitutes new evidence, because it does not duplicate or cumulate other evidence in the record. (Pl.'s Br. at 6.) Plaintiff further argues that the Report constitutes material evidence, because it directly contradicts the vocational testimony that the ALJ relied upon to deny benefits. (Pl.'s Br. at 6.) In response, Defendant argues that the Santagati Report does not constitute "new" evidence, because Santagati wrote the Report well before the hearing. (Def.'s Br. at 15.) Moreover, Defendant contends that because the Report does not relate to Plaintiff individually and does not discuss any of the jobs that the VE identified during the hearing, it does not constitute "material" evidence. (Def.'s Br. at 15.)

In determining whether substantial evidence supports the ALJ's decision, a district court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (noting that reviewing courts are restricted to the administrative record in determining whether substantial evidence supports the decision (citing *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1970))).

However, when a claimant submits evidence not already in the record to the Appeals Council, the Appeals Council must consider that evidence if it is new, material and "relates to the period on or before the date of the hearing decision." 20 C.F.R. §§ 404.970(a)(5), 416.1470(a)(5); *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95-96 (4th Cir. 1991). "Evidence is new if it is not duplicative or cumulative and is material if there is a reasonable possibility that the new evidence would have changed the outcome." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011) (internal quotations marks omitted). If the additional evidence is indeed new, material and relates the relevant period, the Appeals Counsel will only consider it if the claimant shows good cause for not submitting the evidence to the ALJ. 20 C.F.R. §§ 404.970(b), 416.1470(b). [4]

---

[4]    Effective January 17, 2017, the Agency amended 20 C.F.R §§ 404.970(a)-(b), 416.1470(a)-(b) to include a "good cause" requirement as to why the claimant did not submit the evidence to the ALJ. Here, the Appeals Council denied Plaintiff's request for review on July 20, 2017, after the new regulation took effect. (R. at 1-4.) Thus, the new version of the regulation applies to Plaintiff's claims. Plaintiff has not acknowledged or argued the good cause requirement, and Defendant simply states that Plaintiff has failed to establish good cause. (Pl.'s Mem. at 4-7; Def.'s Mem. at 17.) Nonetheless, for the reasons that follow, Plaintiff has failed to establish the materiality of the Santagati Report. Therefore, the Court need not reach the question of whether Plaintiff showed good cause for his delay in submitting it.

26

If the evidence submitted to the Appeals Council meets those requirements, the Court "must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Secretary's findings." *Wilkins*, 953 F.2d at 96.

On October 1, 2015, Santagati, a senior vocational rehabilitation counselor, authored a vocational report that opined that even entry level positions required training from a supervisor or colleague. (R. at 386.) Thus, Santagati concluded that a limitation of occasional interaction with co-workers and supervisors precluded all work. (R. at 386.) Santagati based her opinion on her twenty-four years of experience placing individuals with disabilities into competitive employment. (R. at 386.) Her analysis discussed entry-level jobs at CVS Pharmacy, Shaw's Supermarket, Healthcare Services, Gillette, Merry Maids and Benchmark Senior Living Communities. (R. at 386-87.)

Nothing in the record presented an argument similar to the one advanced by the Santagati Report. Therefore, the Report constitutes "new" evidence.

However, Plaintiff must also demonstrate that the Santagati Report constitutes "material" evidence. *See Finney v. Colvin*, 637 F. App'x 711, 716 (4th Cir. 2016) (holding that when a claimant presents new evidence to the district court, the claimant bears the burden of proving the evidence's materiality). Aside from asserting that the Santagati Report directly contradicts the VE's testimony, Plaintiff makes no argument that the Report establishes a reasonable possibility that it would have changed the outcome. (Pl.'s Br. at 6.) The Report does not address Plaintiff's individualized situation, nor does it address any of the jobs cited by the VE during the hearing. (R. at 79-81, 386-87.) Indeed, the Report contains no indication that Santagati reviewed Plaintiff's case at all, and she did not opine on Plaintiff's particular conditions. (R. at 386-87.)

27

In fact, the widespread use of the very same Report by plaintiffs in other courts evinces the Santagati Report's lack of materiality to any particular plaintiff.[5]

The Santagati Report's general declarations based on a handful of jobs do not trump the testimony of the VE, who analyzed Plaintiff's particular case and appeared for questioning before the ALJ. Here, substantial evidence supports the ALJ's decision to rely on the testimony of the VE. The testifying VE had professional certifications in disability management and rehabilitation counseling. (R. at 328.) She boasted over eighteen years of relevant professional experience at the time of Plaintiff's hearing, having worked as a vocational rehabilitation counselor for twelve years, a vocational rehabilitation specialist for six years and a job placement specialist for one year. (R. at 328-29.) As noted above, the VE relied on Job Browser Pro to access job data from the DOT to formulate her testimony. (R. at 83.) Most importantly, the VE analyzed Plaintiff's particular conditions and identified jobs that he could perform based on the hypothetical questions posed by the ALJ. (R. at 78-82.)

Because the Santagati Report does not constitute material evidence, the Appeals Council properly rejected the Report. The Court finds nothing in Santagati's generic report — that predated the ALJ's decision — to suggest even a possibility that the Report would have changed

---

[5]      *See, e.g., Kidd v. Berryhill*, 2018 WL 3040894, at *4-5 (E.D. Ky. June 19, 2018) (rejecting Santagati's "most generalized (and quite radical)" Report because it "said **utterly nothing** specific about [the plaintiff's] life, health, ability to work or case" (emphasis in original)); *Lara v. Berryhill*, 2017 WL 7790109, at *9-10 (S.D. Tex. Dec. 4, 2017) (declining to accept the Santagati Report because "Santagati identifies no factual basis beyond her own opinion as to why every single job in America requires more than occasional interaction with others. . . . Santagati's opinion is not sufficiently supported by any evidence"); *Reeves v. Berryhill*, 2017 WL 3433706, at *11 (M.D. Pa. Aug. 10, 2017) (approving the ALJ's decision to credit the testifying VE over the Santagati Report because of the VE's "educational background, her extensive professional experience including more than 30 years as a vocational expert . . . and her numerous certifications in vocational rehabilitation, disability management, and rehabilitation counseling").

the outcome of the ALJ's decision.  Consequently, the Appeals Council did not err by denying

Plaintiff's request for review.

V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for

Summary Judgment (ECF No. 15) be DENIED, that Defendant's Motion for Summary Judgment

(ECF No. 13) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District

Judge M. Hannah Lauck and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and**

**recommendations of the Magistrate Judge contained in the foregoing report within**

**fourteen (14) days after being served with a copy of this report may result in the waiver of**

**any right to a de novo review of the determinations contained in the report and such failure**

**shall bar you from attacking on appeal the findings and conclusions accepted and adopted**

**by the District Judge except upon grounds of plain error.**

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  August 17, 2018